

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
10/15/2013

| | | |
|---|---|---|
| IN RE: | § | |
| HDD ROTARY SALES, LLC | § | CASE NO: 11-38053 |
| Debtor(s) | § | |
| | § | CHAPTER 11 |
| | § | |
| ROBERT OGLE | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | ADVERSARY NO. 13-03031 |
| | § | |
| JT MILLER, INC., *et al* | § | |
| Defendant(s) | § | |

## MEMORANDUM OPINION

Robert E. Ogle, the Plan Agent under HDD Rotary Sales, LLC's confirmed plan of reorganization, sued JT Miller, Inc. and Jay Miller to avoid alleged fraudulent conveyances made in the 2009-2010 time period. An initial trial was held on whether HDD was insolvent on the dates of the alleged transfers.

Mr. Ogle did not sustain his burden of proof as to insolvency on the date of the first alleged HDD obligation (June 30, 2009). HDD was insolvent as of the date of the second alleged HDD obligation (on or after December 31, 2009). Accordingly, the Court will schedule a trial on whether the alleged December 31, 2009 obligation is otherwise avoidable.

### Summary of Transfers and Obligations Between HDD and Mr. Miller

HDD, formed on May 29, 2008, provided directional drilling equipment and services for on-shore drilling companies. In August, 2008, Mr. Miller loaned $100,000.00 to HDD. This $100,000.00 loan was later converted into equity and Mr. Miller became a 25% owner of HDD. The parties agree that at some point HDD redeemed Mr. Miller's 333 shares in HDD, but there is a dispute over when this transaction occurred. Mr. Miller claims that the transaction occurred on

June 30, 2009, as evidenced by the Assignment of Membership Interest Agreement dated June 30, 2009. *See* Plaintiff's Exhibit 13. The Assignment Agreement purports to transfer $100,000.00 to Mr. Miller in exchange for a 25% membership interest in HDD. Mr. Ogle alleges that the transaction occurred at a later date, perhaps as late as 2010, and that the Assignment Agreement was backdated to June 30, 2009.

HDD recorded a payable to Mr. Miller for $293,167.00 in its audited Balance Sheet as of December 31, 2009. After the June 30, 2009 agreement, it is apparent that the parties increased the amount owed to Mr. Miller from $100,000.00 to $293,167.00. Mr. Ogle alleges that this $293,167.00 amount is consideration for the redeemed shares. Mr. Miller alleges that a portion of this amount is attributable to his initial $100,000.00 investment and the remaining portion reflects sales commissions and bonuses. *See* Transcript of Trial- Second Day, September 23, 2013, page 128, line 112. On several occasions between May and December of 2010, Mr. Miller received equipment and inventory from HDD to satisfy the $293,167.00 obligation. *See* Transcript, September 23, 2013, page 128, lines 2-5.

## Date of Relevant Obligations and Transfers

Before engaging in a solvency analysis, the Court must determine when HDD incurred two separate obligations and when it satisfied those obligations. The first relevant obligation arises from the original Assignment of Membership Interest where HDD purchased Mr. Miller's 25% member interest in HDD in exchange for a $100,000.00 promissory note, payable to Mr. Miller. The second obligation arises from the parties' oral agreement to increase the obligation from $100,000.00 to $293,167.00. The Court finds that the original purchase of shares occurred on June 30, 2009 and that the oral agreement to increase the note to $293,167.00 occurred no earlier than December 31, 2009. Finally, HDD transferred inventory and equipment to Mr.

Miller on several occasions between May and December of 2010 in satisfaction of the $293,167.00 note owed to Mr. Miller. Thus, HDD incurred two obligations (the first on June 30, 2009 and the second on or after December 31, 2009), and then satisfied those obligations between May and December of 2010 by transferring inventory and equipment to Mr. Miller.

Section 548 of the Bankruptcy Code gives the estate representative the power to avoid transfers and obligations. *See* 11 U.S.C. § 548(a)(1). Avoiding an obligation is distinct from avoiding a transfer made pursuant to the obligation. Thus, if the Court avoids an obligation, then the transfers made by the debtor on account of that obligation are necessarily not made for reasonably equivalent value, and may be set aside as constructively fraudulent if the other requirements are met. *See, e.g.*, *In re Nirvana Rest. Inc.*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006).

Under Section 101(54) of the Bankruptcy Code, "[t]he term 'transfer' means the creation of a lien; the retention of title as a security interest; the foreclosure of a debtor's equity of redemption; or each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of *disposing of or parting with property or an interest in property*.") (internal punctuation and lettering omitted). *See* 11 U.S.C. § 101(54).

Although the Bankruptcy Code does not specify when an obligation is incurred, most courts hold that an obligation is incurred when it becomes legally binding under applicable non-bankruptcy law. *See, e.g.*, *In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325 (11th Cir. 2007). Therefore, if an oral agreement is binding between the parties, the obligation is incurred upon completion of the agreement, not when one party formally invoices the other. *See In re U.S. Aeroteam, Inc.*, 327 B.R. 852 (Bankr. S.D. Ohio 2005).

### *June 30, 2009 Obligation*

The burden is on Mr. Ogle, as the party seeking to set aside a constructively fraudulent transfer or obligation, to establish the date on which the transfer occurred or when the obligation was incurred. 11 U.S.C. § 548(a)(2); *In re GWI PCS 1 Inc.*, 230 F.3d 788, 805 (5th Cir. 2000). The first relevant transaction is HDD's purchase of Mr. Miller's shares in exchange for a $100,000.00 promissory note. HDD's $100,000.00 obligation was incurred when it became legally binding under applicable non-bankruptcy law. The Court finds that the $100,000.00 promissory note to Mr. Miller became binding on HDD on June 30, 2009.

The Assignment Agreement between HDD and Mr. Miller is dated June 30, 2009. Mr. Ogle claims that the agreement was actually executed months later and backdated by Mr. Miller's counsel at the time, Jeff Lambert. Mr. Ogle failed to substantiate his backdating allegation. In support of the backdating allegation, Mr. Ogle presented evidence to show that certain officers and thirds parties believed Mr. Miller to be an HDD equity holder after June 30, 2009. For example, Mr. Ogle offers an email dated January 6, 2010 from Martin Mojica, HDD's counsel, with an attachment of the Company Overview, which lists Mr. Miller as an owner of the company. *See* Plaintiff's Exhibit 22. Mr. Ogle also relies on Mr. Lamberth's billing entries in March and April of 2010 for services relating to an assignment of interest for Mr. Miller. During his testimony, Mr. Lamberth denied backdating the agreement and explained the March and April 2010 billing entries. He clarified that these entries were unrelated to the June 30, 2009 assignment, but instead related to a potential assignment of interest in a newly formed company. *See* Transcript, September 23, 2013, page 98. The Court credits Mr. Lamberth's testimony.

The only remaining support for backdating is that other individuals appeared to believe that Mr. Miller was an equity owner as late as January, 2010. However, this alone does not

prove that Mr. Miller or his attorney backdated the Assignment Agreement. There are several plausible explanations for why certain parties continued to treat Mr. Miller as if he were an equity owner. Both parties agree that management did a poor job of keeping records. Listing Mr. Miller as an equity holder in correspondence could have been an oversight. After June 30, 2009, Mr. Miller remained involved in the company as one of its top salesman. Mr. Miller testified that even after he transferred all of his stock back to HDD, the other owners repeatedly tried to persuade him to reinvest in the company. *See* Transcript, September 23, 2013, page 126. The owners may have intentionally included Mr. Miller in correspondence and listed him as an equity owner in furtherance of their goal of persuading him to reinvest in the company.

The only signed document evidencing the relinquishment of Mr. Miller's ownership interest in the debtor is the Assignment Agreement dated June 30, 2009. Mr. Lamberth testified that he prepared this agreement on or before June 30, 2009. *See* Transcript, September 23, 2013, page 94. Mr. Miller testified that he signed the agreement on June 30, 2009. *Id*. at 113. Finally, Mr. Miller has presented a signed letter of resignation as Vice President of the debtor dated June 30, 2009. Mr. Ogle has not presented sufficient evidence to show that the agreement was backdated. Accordingly, the Court finds that HDD incurred an obligation to pay $100,000.00 to Mr. Miller on June 30, 2009.

### *December 31, 2009 Obligation*

At some point after the June 30, 2009 transfer, the parties orally agreed to increase the amount owed by HDD to Mr. Miller from $100,000.00 to $293,167.00. Based on the totality of the evidence, the Court finds that HDD incurred this additional $193,167.00 obligation no earlier than December 31, 2009. It is undisputed that HDD was insolvent as of December 31, 2009 and

remained insolvent until it filed its bankruptcy petition. Accordingly, the precise date of when this obligation was incurred is not relevant.

HDD's internal accounting records for June 30 and July 30, 2009 show a payable owed to Mr. Miller in the amount of $100,000.00. *See* Defendant's Exhibit 1. The increase to $293,167.00 is first recorded in an audited financial statement prepared by Karlins, Ramey, & Tompkins for the year ended December 2009. *See* Plaintiff's Exhibit 8. This report was not issued until December 21, 2010. Mr. Miller testified that the $193,167.00 increase in the amount owed to him represented "bonuses for sales." *See* Transcript , September 23, 2013, page 128, line 112. Solely for the sole purpose of determining when HDD incurred this obligation, the Court will accept Mr. Miller's testimony that the $193,167.00 amount reflected bonuses for sales[1]. Ordinarily, the bonuses paid to Mr. Miller would have been ordinary income and recorded as an expense on HDD's income statement. Instead the parties agreed to treat Mr. Miller's bonuses as a stock repurchase and HDD apparently recorded no expense for the alleged bonus. It remains unclear whether Mr. Miller treated the receipt of the $193,167.00 as income from a bonus or capital gain from the sale of his shares.

Although credible, Mr. Miller was unable to articulate how or when the $193,167.00 increase occurred. The evidence suggests that these were bonuses for Mr. Miller's sales during 2009. There was no written agreement or any correspondence regarding HDD's obligation to pay commissions. *Id*. at 126. Mr. Miller testified that Gary Haub had orally represented to him that Mr. Miller should expect to earn between "$150,000.00 and $250,000.00 a year in bonuses" in addition to his salary. *See Id*. at 118, lines 11-17. Moreover, Mr. Miller testified that he did not know how the bonuses were computed. *Id*. at 123, line 13. Mr. Miller and Mr. Haub's oral

---

[1] The parties dispute the origin of this obligation. Resolution of that issue is reserved for the final trial on the merits.

understanding of how bonuses would be paid was too indefinite and discretionary to become binding on HDD. HDD did not incur the obligation to pay the $193,167.00 in bonuses until Mr. Haub and Mr. Miller agreed to increase the promissory note to $293,167.00. It appears that the $193,167.00 amount that was added to the note payable was calculated based on Mr. Miller's sales for 2009. Assuming that Mr. Miller's sales for 2009 were not calculated until the end of 2009, the best evidence is that the parties orally agreed to add $193,167.00 at some date later than December 31, 2009. Accordingly, the Court finds that HDD incurred an obligation to pay Mr. Miller the additional $193,167.00 no earlier than December 31, 2009.

## Fraudulent Transfer Claims

Mr. Ogle alleges that HDD was insolvent at the time the alleged obligations were incurred to Mr. Miller in support of his fraudulent transfer actions under section 548 and Texas Uniform Fraudulent Transfer Act. To prevail on a claim for fraudulent transfer under § 548(a)(1)(B), Mr. Ogle must demonstrate: (1) a transfer was made of HDD's property (or an obligation was incurred by HDD); (2) the transfer was made within two years of the petition date; (3) HDD received less than reasonably equivalent value in exchange for the transfer; and (4) HDD was insolvent at the time of the transfer. 11 U.S.C. § 548(a)(1)(B). *In re Supplement Spot, LLC*, 409 B.R. 187, 199 (Bankr. S.D. Tex. 2009).

Mr. Ogle's second fraudulent transfer action arises under Section 544 of the Bankruptcy Code, which allows Mr. Ogle to avoid any transfer of HDD's interest in property that is avoidable under applicable law by a creditor holding an allowed secured claim. *See* 11 § U.S.C. 544(b). Section 24.006(a) of TUFTA provides that a transfer is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time

or the debtor became insolvent as a result of the transfer. *See* TEX. BUS. & COM. CODE ANN. § 24.006(a).

The Court must determine the debtor's solvency at the time that each HDD obligation was incurred and when each relevant transfer occurred.

## Solvency Analysis

The Bankruptcy Code defines insolvency as a "financial condition such that the sum of [the] entity's debts is greater than all of [its] property, at a fair valuation ..." 11 U.S.C. § 101(32). Texas law parallels the Bankruptcy Code's approach to insolvency. Tex. Bus. & Com.Code Ann. § 24.003 (Vernon 2002). The definition of insolvency is the traditional balance sheet test. *In re WRT Energy Corp.*, 282 B.R. 343, 368 (Bankr. W.D. La. 2001). Mr. Ogle must prove, by a preponderance of the evidence, that HDD's liabilities exceeded its assets as of June 30, 2009 and December 30, 2009.

## HDD's Solvency as of June 30, 2009

In some instances, courts have inferred debtor insolvency even though the debtor's financial condition is unascertainable as of the relevant dates. *See, e.g., Murphy v. Nunes (In re Terrific Seafoods, Inc.)*, 197 B.R. 724, 731 (Bankr. D. Mass. 1996). "Insolvency is not always susceptible of direct proof and frequently must be determined by the proof of other facts or factors from which the ultimate fact of insolvency on the transfer dates must be inferred or presumed." *Hassan v. Middlesex Cnty. Nat. Bank*, 333 F.2d 838, 840 (1st Cir. 1964). For example, "[w]here a debtor is shown to be insolvent at a date later than the date of the questioned transfer, and it is shown that the debtor's financial condition did not change during the interim period, insolvency at the prior time may be inferred from the actual insolvency at the later date." *See In re Arrowhead Gardens, Inc.*, 32 B.R. 296, 301 (Bankr. D. Mass. 1983). The usual

presumption is that a known condition will continue to exist under similar circumstances for a reasonable period of time. *Kleinfeld v. Nacol (Matter of Nacol),* 36 B.R. 566, 568 (Bankr. M.D.Fla.1983).

Courts are even more inclined to infer insolvency when a debtor is insolvent "on the first known date and insolvent on the last relevant date, and the trustee demonstrates 'the absence of any substantial or radical changes in the assets or liabilities of the bankruptcy between the retrojection dates,' the debtor is deemed to have been insolvent at all intermediate times."[2] *Id. (*quoting *Foley v. Briden (In re Arrowhead Gardens, Inc.)* 32 B.R. 296, 300 (Bankr. D. Mass. 1983)).* This rule allows the court to conclude that a debtor is insolvent even when there is a deficiency of evidence as to financial status during some of the time period at issue. *Id.*

Bankruptcy Courts in the Fifth Circuit have inferred debtor insolvency as of the date of the transfer without direct evidence when the relevant transfer occurs between two known insolvency dates. For example, the court in *In re Sullivan* determined the debtor to be insolvent as of the date of the transfer based on evidence of insolvency six months before and six months after the transaction in question. *In re Sullivan* 161 B.R. 776, 784.

This case presents a similar timeline. HDD was insolvent on January 1, 2009 as its liabilities exceeded its assets by $616,310.00. HDD Rotary was insolvent on December 31, 2009 as its liabilities exceeded its assets by $3,205,393.00. *See* Plaintiff's Exhibit 8, page 4. The date in question is on June 30, 2009. The issue is whether this Court should infer that HDD was insolvent on June 30, 2009, when it was insolvent six months earlier and six months later.

Courts applying retrojection hold that "[w]hen [retrojection] is sought to be invoked, it is essential the trustee be able to show the absence of any substantial or radical changes in the

---

[2] Many courts extend the term "retrojection" to describe instances where the debtor is found to be insolvent at a date earlier than the transfer and insolvent at a date later than the transfer.

assets or liabilities of the bankrupt between the retrojection dates." *Id.; see also Parlon v. Claiborne (In re Kaylor Equip. & Rental, Inc.),* 56 B.R. 58, 62 Bankr. E.D.Tenn.1985). For example, in *In re War Eagle Floats, Inc.*, the court found that insolvency by retrojection was not appropriate based on six month old financial information:

> Since the sale took place on June 13, 1988, the information provided in the Schedules [showing insolvency on December 31, 1987] is insufficiently contemporaneous with the time of the transfer to demonstrate with any accuracy the insolvency of the corporation. To decide otherwise would not recognize the practicality of the business world and the cyclical nature of the business in which the Debtor was engaged. Six months is simply too long a period considering the strict requirements of § 548(a)(2) specifically necessitating evidence of insolvency on the date of the transfer at issue.

*War Eagle Floats, Inc. v. Travis,* 104 B.R. 398, 400 (Bankr.E.D.Okla.1989).

The court in *In re Sullivan* differentiated itself from *In re War Eagle Floats, Inc.* because the defendant "offered no reason why Mr. Sullivan's financial condition might have drastically improved between January 1990 and August 1990." *In re Sullivan*, 161 B.R. 776, 784 (Bankr. N.D. Tex. 1993). Retrojection was appropriate in *In re Sullivan* because the trustee established the "absence of any substantial balance sheet changes" and the debtor was nowhere near balance sheet solvency at either date. *Id.* at 785. Debtor's liabilities exceeded his assets by $68.9 million in January 1990 and $127.2 million in February 1991. *Id.*

This case is different than *In re Sullivan* for a few reasons. First, the difference in liabilities and assets at HDD's two known insolvency dates is by a much smaller margin than in *In re Sullivan*. HDD's liabilities exceeded its assets by only $616,310.00 on January 1, 2009. This difference increased to $3,205,393.00 by December 31, 2009. In fact, Mr. Ogle's insolvency expert, Mr. Quinn, refers to June 30, 2009 as HDD's "near break-even period." *See* Plaintiff's Exhibit 12, page 3. More importantly, Mr. Ogle has not shown an absence of any substantial or radical changes in HDD's balance sheet between the retrojection dates.

There are two time periods that can be used to infer HDD's insolvency. Insolvency can be shown via retrojection by showing an absence of substantial changes between January 1 and June 30, 2009 or between June 30 and December 31, 2009.[3] However, Mr. Ogle has failed to show the absence of any substantial changes during either of these six month time periods. Both sides have presented evidence that HDD was profitable during the six months leading up to June 30, 2009. There appear to be significant monthly balance sheet fluctuations, especially during June and July of 2009.

Mr. Miller has presented evidence that there was a spike in income during the intervening months between the two known insolvency dates. Mr. Ogle's insolvency expert, Mr. Quinn, acknowledges a substantial change in net income between January and June 2009. *See* Plaintiff's Exhibit 12. Table 2 of Mr. Quinn's expert report shows that the January to June 2009 timeframe is the only six month period where HDD produced a net positive income over the span of three years. *Id*. Even accepting Mr. Quinn's report, HDD had $617,643.00 of net income during this period. Since the plaintiff has failed to "show the absence of any substantial or radical changes in [HDD's] assets or liabilities," between the first known insolvency date and June 30, 2009, the Court will not infer June 30, 2009 insolvency from the December 31, 2008 audit.

Proving insolvency via retrojection for the June 30 to December 31, 2009 time period also fails. There is credible evidence that there have been "substantial or radical changes in the assets or liabilities of the bankrupt" between the later known insolvency date and June 30, 2009. Mr. Miller's expert, Mr. Ramey, reported that HDD's net operating income during July of 2009 was approximately $573,053.26.[4] Mr. Quinn reported that there was a net loss of $3,049,184 over the six month period from July to December 31, 2009. This loss alone shows a substantial

---

[3] Inferring insolvency based on the first six month period would be more aptly named "projection."
[4] The net ordinary income from January 1 to July 31, 2009 is $1,305,098.21. The net ordinary income from January 1 to June 30, 2009 is $732,044.95.

change from June 30, 2009 to December 31, 2009. Mr. Quinn's report does not provide a month to month detail or estimate of net income. There is no direct evidence rebutting Mr. Ramey's claim that HDD earned $573,053.26 in net operating income during July, 2009. Evidence of HDD's large spike in net income during July 2009 constitutes a substantial change between June 30 and December 31, 2009. Accordingly, June 30, 2009 insolvency cannot be inferred from the December 31, 2009 audit.

Although Mr. Ogle has failed to show insolvency by inference, the analysis does not end here. The Court must determine whether June 30, 2009 insolvency is demonstrated by the direct evidence of HDD's status as of June 30, 2009. Because the Court concludes that the June 30, 2009 internal records are unreliable, and because those records are the sole direct evidence of June 30, 2009 insolvency, the Court concludes that Mr. Ogle has not sustained his burden of proof.

With respect to the reliability of the June 30, 2009 records, there is no evidence that the internal records are fraudulent. Instead, it is apparent that the records are incomplete and that various journal entries (particularly with respect to inventory accounting) were made in a haphazard fashion. Both experts agree with this conclusion. Accordingly, the task of determining HDD's solvency as of June 30, 2009 is daunting because the internal records are unreliable. Nonetheless, the Court can make some reasonable inferences based on HDD's internal records, the expert reports provided, and basic accounting principles.

A debtor's insolvency at time of an alleged fraudulent transfer requires a fact-intensive determination based on bankruptcy court's review of debtor's financial records and status at time of transfers. 11 U.S.C. § 548(a); *In re Hung*, 387 B.R. 766 (Bankr. N.D. Iowa 2008). To perform the balance sheet insolvency test, courts conduct a two-step analysis. The court first determines

whether the debtor was a "going concern" or was "on its deathbed." *In re Brentwood Lexford Partners, LLC*, 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003). The court must then value the debtor's assets, depending on the status determined in the first inquiry, and apply the balance sheet test to determine whether the debtor was solvent. *Id*. For a debtor that was a going concern, the court would "determine the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time." *Id*. As a going concern, the debtor would not likely face a forced sale. Accordingly, a fair market valuation best determines a fair market price. The Fifth Circuit has instructed that the fair value of property is determined "... by 'estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions.' " *Brentwood Lexford,* 292 B.R. at 268 (citations omitted).

In reaching its conclusions on "fair valuation," the court may adopt the asset values of one party or the other, or the court may choose its own fair valuation figure after weighing all the evidence. *See, e.g., Roblin Indus.,* 78 F.3d at 35 (stating that if possible, insolvency determinations should be based on seasonable appraisals or expert testimony, but that "[b]ecause the value of property varies with time and circumstances, the finder of fact must be free to arrive at the 'fair valuation' defined in § 101[(32)] by the most appropriate means."); *See also Syracuse Eng'g Co.,* 110 F.2d at 470 (upholding "middle course" that court took with respect to value of assets and liabilities). *In re WRT Energy Corp*., 282 B.R. 343, 370 (Bankr. W.D. La. 2001).

Each party presented testimony as to what adjustments ought to be made to HDD's monthly internal records for determining solvency. After making their respective adjustments, the balance sheet differences between Mr. Ramey's and Mr. Quinn's expert reports are

illustrated in Table 1.[5] The "Difference in Total Assets" column shows how Mr. Ramey arrived at a Total Asset figure that is $1,004,299.48 less than Mr. Quinn's estimate.

**Table 1**

| **Balance Sheet** | Mr. Ramey | Mr. Quinn | Difference |
|---|---|---|---|
| Total Assets | $4,188,979.00 | $3,184,680.00 | $1,004,299.00 |
| Total Liabilities | $2,967,658.00 | $3,208,808.00 | ($241,150.00) |
| Equity | $1,221,321.00 | ($24,128.00) | $1,245,449.00 |
| **Difference in Total Assets** | | | |
| Difference in Quickbooks | $354,516.00 | | |
| Inventory Adjustment | ($1,297,815.48) | | |
| Accounts Receivable | ($61,000.00) | | |
| **Total Difference** | ($1,004,299.48) | | |

The difference in Total Assets shown above is based on two things. First, Mr. Quinn and Mr. Ramey are working from two separate Quickbooks files. Mr. Ramey used a Quickbooks file updated in February 2012 and Mr. Quinn used a Quickbooks file updated in October 2012. This accounts for $354,516.00 of the $1,004,299.48 Total Asset difference. Mr. Ramey started with a $4,543,495.00 Total Assets figure while Mr. Quinn started with $4,188,979.00. The remaining difference in Assets comes from two adjustments made by Mr. Quinn: (1) a $1,297,815.48 inventory reduction, and (2) a $61,000.00 accounts receivable reduction.

Mr. Ramey's Total Liabilities are $241,150.00 less than Mr. Quinn's Total Liabilities. This difference also comes from the fact that they are using Quickbooks files updated at different times. Mr. Ramey's February 2012 Quickbooks file has two differences in liabilities. First, under current liabilities, the Accounts Payable amount is $1,754,469.00, which is $89,650.41 less than the amount listed in the October 2012 Quickbooks file ($1,844,119.41-$1,754,469.00).

---

[5] This table is derived from page 6 of Mr. Ramey's report and amended to include Mr. Quinn's proposed $61,000 reduction in Accounts Receivable. *See* Plaintiff's Exhibit 14, p. 6.

Next, under long term liabilities, the Notes Payable to Owners amount is $808,270, which is $151,500 less than the Notes Payable to Owners listed in the October 2012 Quickbook file. From this $151,500 Note Payable difference, $100,000 of it comes from the fact that the October 2012 Quickbooks file correctly includes the $100,000 Note Payable owed to Mr. Miller. The remaining $51,500 difference presumably reflects an additional amount included in what is owed to one of the remaining owners of HDD. Before making any balance sheet adjustments, this Court is starting from the October 2012 Quickbooks file because it appears to be more accurate.

**Mr. Quinn's Proposed Adjustments**

1. **Inventory Reduction to Correct Overstatement**

In this case, it is appropriate to make adjustments from HDD's internal records to reflect its actual assets and liabilities as of June 30, 2009. The parties in this case argued over whether it was appropriate to make a $1,297,815.48 inventory adjustment. The evidence shows that this inventory adjustment is warranted. Accordingly, HDD's assets should be reduced by $1,297,815.48.

Mr. Quinn testified that an inventory adjustment is appropriate because the October 2012 Quickbooks file overstates HDD's inventory by $1,297,815.48:

> They were called inventory adjustments, and the notation in the ledger said it was to correct. Like July had a complete swing, and it said to correct an overstatement of inventory. And then it appears the auditors at year end eliminated those, and so I tried to keep a consistent treatment of those and just pulled it out so it reduces the noise in the numbers.

*See* Transcript, September 23, 2013, page 21.

HDD's Profit & Loss Statement for January through June 2009 includes a $1,297,815.48 reduction in its Cost of Goods Sold Category from the inventory adjustment. Moreover, the July 31, 2009 ledger stated this reduction was to correct an overstatement of inventory. Based on the fact that the inventory adjustment was made in the Cost of Goods Sold category for the June 30,

2009 Profit & Loss statement, Mr. Quinn made a corresponding $1,297,815.48 reduction in inventory on the June 30, 2009 Balance Sheet. Mr. Ramey testified that the inventory adjustment is unwarranted because there is no way of knowing whether the inventory was present on June 30, 2009. *See* Transcript, September 23, 2013, pages 84-85. While the Court agrees that there is no way of knowing with certainty, the best evidence suggests that inventory was overstated by $1,297,815.48 on the June 30, 2009 balance sheet.

### 2. Accounts Receivable Reduction to reflect Fair Market Value

HDD's internal records show the cost value of the assets, rather than the fair market value. Mr. Quinn claims that restating these assets to fair market value would reduce the overall value of the assets. For example, he testified that the value of accounts receivable must be discounted for uncollectible debts. *See* Transcript, September 23, 2013, page 24. In the report, Mr. Quinn noted the allowance for doubtful accounts on accounts receivable as of December 31, 2009 was 8.2%. *See* Plaintiff's Exhibit 12. Mr. Quinn applied that same 8.2% to the $738,299.43 accounts receivable balance as of June 30, 2009 and arrived at a reduction of approximately $61,000. *Id.*

The Court agrees that adjusting the Accounts Receivable to include an allowance for doubtful accounts is appropriate. However, the 8.2% figure used by Mr. Quinn was miscalculated. Based on the December 31, 2009 audited financial statement, there was a 7.6% allowance for doubtful accounts.[6] *See* Plaintiff's Exhibit 8, page 2. After reducing the $738,299.43 accounts receivable balance by 7.6%, the proper Accounts Receivable reduction comes to approximately $56,110.76.

**Mr. Ramey's Proposed Adjustments**

---

[6] The allowance for doubtful accounts was $26,233.00. The Accounts Receivable, *net* of allowance for doubtful accounts was $318,612. Thus, (26,233)/(26,233+318,612)= .0761.

1. **Asset Adjustment: Inventory Mark Up to Reflect Fair Market Value**

Mr. Ramey's report did not include a fair market value adjustment for any balance sheet item. However, Mr. Ramey's testimony implied that the value of inventory should be adjusted upward to reflect its fair market value. The Court rejects this argument.

It may be true that HDD sold its pipe inventory by for 20-30 percent more than its acquisition cost. *See* Transcript, September 23, 2013, page 81, line 10-12. However, Mr. Ramey agreed with the Court that "if it cost them [HDD] 35 to 40 percent to get that sold, you wouldn't mark up the inventory." *Id.* at lines 13-17. In this case, that's exactly what appears to have happened. There was a $3.2 million dollar deficit at the end of 2009. Only a portion of this deficit can be explained by a $984,000 legal settlement expense. Hence, there was approximately a $2.3 million cumulative deficit over 2009. Accordingly, an inventory mark-up is not warranted.

2. **Liability Adjustment: Subordination of Notes to Owners**

In Mr. Ramey's report, he noted that of the $2,967,658 in total liabilities, $808,270 was due to two owners of the company. Mr. Ramey suggested that it was appropriate to subordinate the $808,270 in notes payable, and remove it from the balance sheet test. However, Mr. Ramey offered no rationale as to why liabilities owed to HDD's owners do not reflect actual liabilities as of June 30, 2009. The Court finds no support for removing liabilities just because they are owed to HDD's owners.

### Best Estimate of HDD's Balance Sheet as of June 30, 2009

Table 2 depicts the Court's best estimate of HDD's assets and liabilities as of June 30, 2009. Table 2 shows that HDD's liabilities exceeded its assets by $19,238.35 on June 30, 2009. However, because this estimate is based on inherently unreliable and incomplete information, Mr. Ogle could not prove that HDD was insolvent on June 30, 2009. Mr. Quinn credibly

testified that he adjusted only some of HDD's assets and liabilities. Mr. Ramey credibly testified that the internal books and records were inherently unreliable at June 30, 2009. For a company with approximately $4,000,000.00 in assets and approximately $4,000,000.00 in liabilities, the Court will not rely on selective accounting adjustments that produce insolvency by only 0.50% of the total asset base. The evidence is inadequate to satisfy Mr. Ogle's burden of proof.

### Table 2: Summary of Court Findings

| | |
|---|---|
| **Assets** | |
| HDD Assets in QB File | $4,543,495.90 |
| Inventory Adjustment | ($1,297,815.48) |
| Accounts Receivable Adjustment | ($56,110.76) |
| Total Assets | $3,189,569.66 |
| | |
| **Liabilities** | |
| HDD Liabilities in QB File | $3,208,808.01 |
| Total Liabilities | $3,208,808.01 |
| | |
| **Equity/Capital (Deficit)** | **($19,238.35)** |

### HDD's Solvency as of December 31, 2009

The parties have stipulated that as of December 31, 2009, HDD was insolvent. The audit report shows that HDD Rotary's liabilities exceeded its assets by $3,205,393 at the end of 2009. Mr. Miller's expert witness, Mr. Ramey, testified that HDD became insolvent sometime between "September and December of 2009." *See Id.* at 87, lines 11-17. Accordingly, the debtor was insolvent when HDD incurred the $193,167.00 obligation owed to Mr. Miller.

### Conclusion

Mr. Ogle has not satisfied his burden of proof to demonstrate insolvency at June 30, 2009. That is the date when HDD incurred the initial $100,000.00 obligation to Mr. Miller. HDD was insolvent when it incurred the additional $193,167.00 obligation. Accordingly, the

Court will conduct a trial on whether the latter obligation is avoidable on November 25, 2013 at 1:30 pm.

**SIGNED <u>October 15, 2013.</u>**

_____
**Marvin Isgur**
**UNITED STATES BANKRUPTCY JUDGE**