

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
**06/27/2014**

| | | |
|---|---|---|
| IN RE: | § | |
| **HDD ROTARY SALES, LLC** | § | **CASE NO: 11-38053** |
| Debtor(s) | § | |
| | § | **CHAPTER 11** |
| | § | |
| **ROBERT OGLE** | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 13-03031** |
| | § | |
| **JT MILLER, INC.,** *et al* | § | |
| Defendant(s) | § | |

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM OPINION

On February 24, 2013, Robert Ogle, the Plan Agent for HDD Rotary Sales, LLC, filed a complaint to avoid alleged fraudulent conveyances made to Jay Miller and JT Miller, Inc. during the 2009-2010 time period. (Case No. 13-03031, ECF No. 1). On April 4, 2013, the Court bifurcated the trial. An initial trial was held on whether HDD was insolvent on the dates of the alleged transfers and obligations.

In an October 15, 2013 Memorandum Opinion, the Court held that: (i) HDD incurred a $100,000.00 obligation to Mr. Miller on June 30, 2009 and (ii) HDD incurred an obligation to pay Mr. Miller an additional $193,167.00 no earlier than December 31, 2009. (ECF No. 36 at 5-7). The Court held that HDD was solvent when it incurred the $100,000.00 obligation and insolvent when it incurred the $193,167.00 obligation.[1] *Id.* Accordingly, on March 7, 2014, the Court conducted a trial on whether the $193,167.00 obligation is avoidable.

---

[1] The Court held that "[b]ased on the totality of the evidence, the Court finds that HDD incurred this additional $193,167.00 obligation no earlier than December 31, 2009. It is undisputed that HDD was insolvent as of December 31, 2009 and remained insolvent until it filed its bankruptcy petition. Accordingly, the precise date of when this obligation was incurred is not relevant."). (ECF No. 36 at 6).

The main issue at the second trial was whether HDD Rotary received reasonably equivalent value in exchange for incurring the $193,167.00 obligation. The parties dispute the origin of this obligation: Jay Miller alleges that the $193,167.00 obligation represents bonus compensation for his sales, while Mr. Ogle maintains that this obligation relates to HDD's redemption of Mr. Miller's equity interest in HDD.

Because the $193,167.00 originated as a bonus to Miller, the Court finds that the obligation is not avoidable. Additionally, none of the transfers made by HDD to Jay Miller and JT Miller Inc. in satisfaction of this obligation are avoidable. Accordingly, the Court recommends that the District Court grant judgment to J.T. Miller and to Miller on Mr. Ogle's fraudulent transfer claims.

### Bankruptcy Court's Authority

The Supreme Court's decision in *Stern v. Marshall* recognized significant limitations on bankruptcy courts' authority. *Stern v. Marshall*, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). *Stern* concerned a bankruptcy court's authority over a debtor's common-law counterclaim to a proof of claim filed against the estate. The Supreme Court held that a bankruptcy court may not constitutionally enter a final judgment over a counterclaim that would not necessarily be resolved by the resolution of the proof of claim. *Id.* at 24. The counterclaim did not constitute a "public rights" dispute. *Id.* at 21. Although public rights disputes may be decided by non-Article III tribunals, public rights disputes must involve rights "integrally related to a particular federal government action." *Id.* at *17–18. Entering a final judgment with respect to the counterclaim would be an impermissible exercise of the judicial power of the United States. *Id.* at 21.

Other types of disputes frequently decided by bankruptcy courts may also require adjudication by an Article III court. For example, in *Granfinanciera, S.A. v. Nordberg,* the

Supreme Court held that the adjudication of a fraudulent transfer claim against a creditor who had not filed a proof of claim did not fall within the public rights exception. 492 U.S. 33, 54–55 (1989). Following *Stern,* it is unclear whether the adjudication of a fraudulent transfer claim against a creditor who *has* filed a proof of claim falls within the public rights exception.

In this case, the Court need not answer that question because neither of the defendants in this fraudulent transfer lawsuit have filed a proof of claim in HDD Rotary's bankruptcy case. Accordingly, the Court does not have the authority to enter a final judgment in this case. Moreover, the Fifth Circuit has held that parties cannot consent to a bankruptcy court's adjudication of claims that are outside the constitutional scope of a bankruptcy court's authority. *In re BP RE, L.P.*, 735 F.3d 279, 286-87 (5th Cir. 2013)("We adopt the compelling and thorough reasoning of *Waldman,* which held that parties cannot consent to such circumvention of Article III that impinges on the structural interests of the Judicial Branch. *Waldman* was the first post-*Stern* appellate decision to address consent as it relates to the bankruptcy court's constitutional authority.").

A dismissal with prejudice is treated as an adjudication on the merits. *Anthony v. Marion County General Hosp.,* 617 F.2d 1164, 1169-70 (5th Cir. 1980). In *Executive Benefits Ins. Agency*, the Supreme Court reiterated that once a bankruptcy court identifies a *Stern* claim, "[t]he bankruptcy court should hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for *de novo* review and entry of judgment." *Executive Benefits Ins. Agency v. Arkison*, 2014 WL 2560461 (2014). Accordingly, this Court may not issue a final order or judgment in the Defendants' favor. Pursuant to Rule 9033, this Court submits the following proposed findings of fact and conclusions of law for the District Court's consideration.

### Proposed Findings of Fact and Conclusions of Law

At the March 7, 2014 trial, Mr. Ogle's exhibits 1-15 were admitted into evidence.  Robert Ogle, Matt Odom, Glea Ramey, Rex Inman, and Jay Miller each testified at the March 7 hearing. The Court will briefly summarize the relevant parts of each witness's testimony.

### Robert Ogle

Mr. Ogle was appointed Plan Agent of HDD in December, 2011.  He has reviewed HDD's business records and gained familiarity with HDD's transaction history with Jay Miller and JT Miller, Inc.  Mr. Ogle testified about three documents to support his theory that the $193,167.00 obligation payable to Mr. Miller was for the redemption of his equity interest in HDD. (Exhibits 2, 4, 5).  Mr. Ogle prepared Exhibit 4, entitled "Jay Miller and JT Miller Inc. Transaction history and summary," by reviewing HDD's Quickbooks accounts.  Using Exhibit 4, Mr. Ogle described the parties' transaction history as follows: On August 28, 2008, Jay Miller loaned HDD $100,000.00 in exchange for a $100,000.00 note receivable.  On December 31, 2008, Jay Miller was issued HDD stock with a par value of $333.00.  When Karlins & Ramey audited HDD in December of 2010, they made adjusted entries to HDD's books as of December 31, 2009: the $333.00 worth of par value common stock was redeemed by HDD in exchange for a $193,500.00 note payable to Jay Miller.  On March 31, 2010, Jay Miller's $100,000.00 note receivable was converted into equity.  The converted equity interest was then redeemed for an additional $100,000.00 obligation payable to Mr. Miller.  From June through December 2010, there were 8 transfers of inventory and equipment from HDD to JT Miller Inc. in satisfaction of the entire $293,500.00 debt owed to JT Miller Inc.

Next, Mr. Ogle testified that HDD's 2009 audit[2] treats the $193,167.00 as a stock redemption. (Exhibit 2). Note 9 on page 13 of the audit characterizes the $193,167.00 amount as a note due to Mr. Miller for HDD's redemption of Mr. Miller's 133 shares.[3]  (Exhibit 2 at 13). Note 11 on page 13 records the entire amount owed to Jay Miller as a note due to JT Miller Inc. for $293,167.00. *Id*. He also noted that the $193,167.00 amount was not included in the $878,872.00 amount listed on page 3 under the "salaries and benefit expense." (Exhibit 2 at 3).

Finally, Mr. Ogle testified that a representation letter signed by Gary Haub and Rex Inman treats the $193,167.00 amount as stock redemption . (Exhibit 5).  On page 2, the letter states: "Jay Miller, former owner and employee is owed $293,167.00 of which $193,500.00 related to the purchase of Jay's 333 equity shares." (Exhibit 5).

Mr. Ogle further testified that (i) there are no HDD documents evidencing any sales commissions or bonuses paid to Mr. Miller and (ii) to Mr. Ogle's knowledge, no other owner ever received a bonus or commission.

Mr. Ogle testified about HDD Rotary's 2009 and 2010 tax returns to support his position that the poor financial health of HDD Rotary demonstrates that Mr. Miller's sales efforts did not provide real benefit to the company. (Exhibits 14 and 15).  HDD Rotary's 2009 tax return shows that HDD Rotary reported a loss of $3,523,014.00 for 2009. (Exhibit 14 at 5). It also shows that HDD earned (i) $16,741,057.00 in gross sales, (ii) $1,250,436.00 in gross profit, and (iii) a 7.5% gross margin for 2009. *Id*.  In 2010, HDD reported (i) a $4,575,032.00 loss, (ii) $582,569.00 in gross profit, and (iii) a 5.3% gross margin.  (Exhibit 15 at 7).

---

[2] Exhibit 2 is an audit of HDD Rotary Sales as of December 31, 2009, completed by Karlins & Ramey on December 21, 2010.

[3] The footnote in Exhibit 3 (work paper) again refers to the $193,500.00 as the amount owed to Jay Miller for the redemption of his 333 shares.

**Matt Odom**

Matt Odom, junior accountant for Karlins & Ramey, prepared HDD Rotary's 2009 audit. Exhibit 1, "Assignment of Membership Interest" (dated June 30, 2009), purports to be HDD's purchase of Jay Miller's interest in HDD Rotary for $100,000.00.

Mr. Odom testified that Karlins & Ramey did not have this document when they conducted HDD Rotary's 2009 audit. He explained that if Karlins & Ramey had this document at the time of the audit, then they would have (i) booked the redemption of Jay Miller's stock for $100,000.00 rather than at $293,500.00 and (ii) inquired as to the origin of the $193,500.00[4] owed to Mr. Miller. Mr. Odom claims that Gary Haub represented that the entire $293,500.00 amount owed to Jay Miller was for the redemption of his shares. Mr. Odom explained that Mr. Haub's oral representation is inconsistent with Exhibit 1, which indicates that Mr. Miller's 25% interest in HDD (333 shares) was purchased for $100,000.00. Because of Mr. Haub's representation, Mr. Odom never inquired about the origin of the $193,500.00 debt to Mr. Miller.

Mr. Odom prepared tax returns for HDD Rotary, Jay Miller, and JT Miller, Inc. Mr. Odom claims that he repeatedly asked Mr. Haub about HDD's compensation agreement with Mr. Miller, but Mr. Haub stated that it was a verbal arrangement. Mr. Odom only confirmed the amount of debt HDD owed with Jay Miller, but not the origin of the debt.

Mr. Odom testified that Jay Miller has not yet reported the $193,167.00 as income because he is a "cash basis" taxpayer. He further explained that if Jay Miller received the $193,1670.00 bonus in cash, then he would have been required to report this as income on his personal income tax return in the year it was received.

---

[4] Some documents record a $193,500.00 obligation owed to Mr. Miller and other documents record a $193,167.00 obligation. The difference is equal to the par value of the shares and is de minimis.

He explained that JT Miller Inc.'s S-corporation tax return, which flows into Jay Miller's individual return, shows a $293,500.00 equity contribution into JT Miller Inc. According to Mr. Odom, JT Miller Inc. will have to report income as each piece of inventory and equipment is sold (without an adjusted basis). This amount will then flow down to Jay Miller's individual tax return.

**Glea Ramey**

Glea Ramey, partner for Karlins & Ramey, was the partner working on HDD Rotary's 2009 audit. Mr. Ramey testified that Karlins & Ramey did not have the 'Assignment of Membership Interest" document during the audit. Mr. Ramey had previously testified that Karlins & Ramey did have the Assignment Agreement when the 2009 audit was prepared. Mr. Ramey retook the stand and changed his prior testimony. He agreed with Mr. Odom's testimony that if they would have had Exhibit 1, then they would have booked the redemption for $100,000.00 and inquired about the $193,500.00.

According to Mr. Ramey, he concluded that the $193,500.00 related to the redemption of Jay Miller's 333 equity shares based on Gary Haub's oral representation. Mr. Ramey stated that he confirmed with Mr. Miller that $293,500.00 was the amount owed to him, but did not confirm the origin of this debt.

The Court gives little weight to Mr. Ramey's testimony due to the inconsistency between Mr. Ramey's testimony during this trial and his testimony during the Phase I trial.

**Rex Inman**

Rex Inman, Jr., an HDD owner, testified that Jay Miller was responsible for about $1,500,000.00 of HDD's $1,850,000.00 in gross profits earned in 2009 and 2010. Mr. Inman stated that Mr. Miller earned $193,500.00 in commissions for his sales in 2009. He explained

that Mr. Miller could not have gotten the $193,500.00 for his ownership interest because he had already received a $100,000.00 note in exchange for his shares in June of 2009.  However, during Mr. Inman's deposition, taken a few weeks before the March 7 trial, he stated that he believed that the $193,500.00 paid to Mr. Miller was for Mr. Miller's "buyout." Later in the deposition he corrected himself and stated that the $193,500.00 reflected a bonus for Mr. Miller's 2009 sales.

Mr. Inman testified that he also had a bonus agreement with HDD.  He stated that there was no written agreement but that there was an understanding that Mr. Inman would receive an annual bonus.  He testified that he has received commissions from HDD in past years and that one year he received a cash bonus between $30,000.00 and $50,000.00.

### Jay Miller

Jay Miller previously worked for a company named Enroc.  In 2008, he received a $120,000.00-125,000.00 salary plus a bonus of approximately $80,000.00 at Enroc.  In 2007, Mr. Miller sold $6,000,000.00 in pipe and received a bonus of at least $60,000.00.  He testified that he would not have come to work for HDD for the same salary ($125,000.00) and no bonus.  Mr. Miller did not have a written bonus agreement with Enroc.  He testified that this is not uncommon in the pipe equipment and inventory sales industry.

Mr. Miller testified about his sales of HDD equipment and inventory from September 2008 through July 2010.  Mr. Miller provided the Court with a complete list of his sales (entitled "Invoice/ Sales Order Worksheet Log") for 2008, 2009, and 2010, along with the supporting invoices for each sale.  (See CD Roms).  Mr. Miller's lists show that he made $2,382,497.26 in sales for 2008, $9,155,472.59 in sales for 2009, and $5,019,057.27 in sales for 2010.  The Court fully credits Mr. Miller's testimony regarding his sales.

Mr. Miller testified that the $193,167.00 amount was for bonuses owed to him for his sales in 2009 and part of 2010.  He testified that (i) there was no written bonus agreement, (ii) the $193,167.00 amount was calculated by Gary Haub, and (iii) that he was uncertain as to how and when the bonus was calculated.

Jay Miller stated that he did not receive any money or interest for the redemption of his shares other than the $100,000.00 receivable in June 2009.  He also denied that any of the debt he was owed after June 30, 2009 was ever converted back into equity.

Exhibit 6 consists of nine invoices evidencing a series of transfers of inventory and equipment from HDD Rotary to JT Miller Inc. from June 2 to July 9, 2010. (Exhibit 6).  Mr. Miller testified that each of these transfers were in satisfaction of the $193,167.00 he was owed in bonuses.  The sum of these invoices is $195,823.00.  Exhibit 7 is a document from JT Miller, Inc.'s internal records. (Exhibit 7).  This document records a "shareholder distribution" of $193,500.00 as of May 27, 2010.  This JT Miller Inc. document also shows that the nine transfers between June 2 and July 9, 2010 were applied to satisfy the $193,500.00 amount owed to JT Miller.  Mr. Miller testified that he is uncertain as to why the $193,500.00 was characterized as a "shareholder distribution."  He speculated that Deanna Reynolds, the bookkeeper for HDD Rotary, likely came up with the term "shareholder distribution" when advising Ken Deason (bookkeeper for JT Miller Inc.) on how to book the transactions.

### Summary of Transactions Between HDD and Jay Miller

Although the various witnesses reached differing conclusions about the legal characterizations of the HDD/Miller transactions, the Court concludes that HDD received fair consideration for each transaction.  After considering all of the testimony and exhibits, the Court concludes that the transactions are best characterized as set forth in this summary.

In August of 2008, Jay Miller loaned $100,000.00 to HDD Rotary. This $100,000.00 loan was converted into equity and Mr. Miller became a 25% owner of HDD. On June 30, 2009, HDD redeemed Jay Miller's 25% interest in HDD (333 shares). This is evidenced by the "Assignment of Membership Interest" dated June 30, 2009. (Exhibit 1). At that time, HDD recorded a $100,000.00 payable to Mr. Miller. This transfer occurred before HDD became insolvent.

Gary Haub, an owner of HDD, orally promised to pay Mr. Miller an annual bonus based on his sales of HDD equipment and inventory. Mr. Haub represented to Mr. Miller that he should expect to receive an annual bonus between $150,000.00 and $250,000.00. This oral promise was enforceable against HDD. No earlier than December 31, 2009, but no later than May 27, 2010, Mr. Haub determined that Mr. Miller was owed a $193,167.00 bonus for his sales. This bonus was calculated based on Mr. Miller's sales during 2009, and possibly for a portion of his 2008 and 2010 sales.[5] HDD was insolvent when Mr. Haub calculated the $193,167.00 bonus.

Although the $100,000.00 and $193,167.00 obligations owed to Mr. Miller arose from separate transactions, and for different purposes, HDD Rotary recorded the entire $293,167.00 as an obligation arising from the redemption of Jay Miller's shares in HDD Rotary. JT Miller Inc. recorded the $193,167.00 obligation as an amount owed for the redemption of Mr. Miller's shares by labeling it a "shareholder distribution." The parties' booking of the $193,167.00 obligation was an error resulting from Mr. Haub's oral representation to Mr. Ramey and Mr.

---

[5] The $193,167.00 amount may have included some of Jay Miller's sales in 2008 and 2010 but this is unclear because Gary Haub did not testify. The Court does not have reliable evidence on what time period the bonus covers. JT Miller Inc. recorded the "193,500.00" obligation as of May 27, 2010 so the bonus may include sales for the January- May 2010 time period.

Odom.  There was no evidence to support the theory that the parties agreed to recharacterize the $193,167.00 obligation as a stock redemption for mutual benefit.

On several occasions between June and December of 2010, HDD transferred equipment and inventory to JT Miller, Inc. in satisfaction of the $193,167.00 obligation and the $100,000.00 obligation.

## Reasonably Equivalent Value

Mr. Ogle has asserted constructive fraudulent conveyance actions under § 548 of the Bankruptcy Code and section 24.006(a) of the Texas Uniform Fraudulent Transfer Act ("TUFTA").  Under § 548 of the Bankruptcy Code:

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily… **received less than a reasonably equivalent value** in exchange for such transfer or obligation; and was insolvent on the date that such transfer was made or such obligation was incurred…

11 U.S.C. § 548(a)(1)(B).

Section 24.006(a) of TUFTA provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation **without receiving a reasonably equivalent value** in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Tex. Bus. & Com. Code Ann. § 24.006(a).

To prevail on his fraudulent transfer claims, Mr. Ogle must show that HDD did not receive "reasonably equivalent value" in exchange for an obligation incurred or transfer made while HDD was insolvent.

Reasonably equivalent value under § 548(a)(1)(B)(i) is not defined in the Bankruptcy Code.  Value is defined in § 548(d)(2) as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor..." Courts have struggled to provide a workable definition of reasonably equivalent value. *In re Enron Corp.*, 2005 WL 6237551 (Bankr. S.D. Tex. Dec. 9, 2005).

In *BFP*, the Supreme Court noted: "As we have emphasized, the inquiry under § 548(a)(2)(A) [is] whether the debtor has received value that is substantially comparable to the worth of the transferred property."  *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 548 (1994). The Fifth Circuit has held that "[t]o measure reasonably equivalent value, we judge the consideration given for a transfer from the standpoint of creditors. The proper focus is on the net effect of the transfers on the debtor's estate, [and] the funds available to the unsecured creditors." (citations omitted). *In re TransTexas Gas Corp.*, 597 F.3d 298, 306 (5th Cir. 2010).

### Distinguishing Transfers and Obligations

Section 548 of the Bankruptcy Code gives the estate representative the power to avoid transfers and obligations. *See* 11 U.S.C. § 548(a)(1).  Avoiding an obligation is distinct from avoiding a transfer made pursuant to an obligation.  Thus, if the Court avoids an obligation, then the transfers made by the debtor on account of that obligation are necessarily not made for reasonably equivalent value, and may be set aside as constructively fraudulent if the other requirements are met. *See, e.g.*, *In re Nirvana Rest. Inc.*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006).

Under Section 101(54) of the Bankruptcy Code, "[t]he term 'transfer' means the creation of a lien; the retention of title as a security interest; the foreclosure of a debtor's equity of

redemption; or each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of *disposing of or parting with property or an interest in property*.")(internal punctuation and lettering omitted). *See* 11 U.S.C. § 101(54).

Although the Bankruptcy Code does not specify when an obligation is incurred, most courts hold that an obligation is incurred when it becomes legally binding under applicable nonbankruptcy law. *See, e.g.*, *In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325 (11th Cir. 2007). Therefore, if an oral agreement is binding between the parties, the obligation is incurred upon completion of the agreement, not when one party formally invoices the other. *See In re U.S. Aeroteam, Inc.*, 327 B.R. 852 (Bankr. S.D. Ohio 2005).

### Analysis

The Court must evaluate whether HDD received "reasonably equivalent value" for each obligation incurred and transfer made while HDD was insolvent.  In the October 15, 2013 Memorandum Opinion, the Court held: "It is undisputed that HDD was insolvent as of December 31, 2009 and remained insolvent until it filed its bankruptcy petition. Accordingly, the precise date of when this obligation was incurred is not relevant." (ECF No. 36 at 6).

HDD was solvent when it incurred the $100,000.00 obligation to Mr. Miller in connection with the redemption of Jay Miller's 25% interest in HDD (333 shares).  For the reasons discussed in the "Bonus Obligation" section below, regardless of whether HDD was insolvent when it incurred the $193,167.00 obligation, Mr. Ogle cannot avoid this obligation. Although HDD was insolvent for each transfer of equipment and inventory made to Mr. Miller between May and December of 2010, these transfers are not avoidable because they were transfers made in satisfaction of unavoidable obligations.  Accordingly, Mr. Ogle has failed to demonstrate that any of the transactions between HDD and Jay Miller are avoidable.

The Court will analyze each transaction between HDD and Jay Miller by determining whether (i) the transfer was made or the obligation was incurred when HDD was insolvent; and (ii) if HDD was insolvent at the time of such transfer or obligation, whether HDD received reasonably equivalent value.

### Original Stock Redemption

Sometime towards the end of 2008, Jay Miller's initial $100,000.00 loan was converted into equity and Mr. Miller became a 25% owner of HDD.  On June 30, 2009, HDD redeemed Jay Miller's 25% interest in HDD (333 shares). This is evidenced by the "Assignment of Membership Interest" dated June 30, 2009. (Exhibit 1).   At that time, HDD incurred a $100,000.00 obligation to Mr. Miller in exchange for Jay Miller's shares.  This transaction falls outside the scope of § 548(a)(1)(B) of the Bankruptcy Code and section 24.006(a) of TUFTA because it occurred before HDD became insolvent.

### Bonus Obligation

If Mr. Haub's oral promise to pay Mr. Miller an annual bonus was enforceable against HDD, then HDD received reasonably equivalent value in exchange for the $193,167.00 obligation by satisfying its existing obligation to pay Mr. Miller an annual bonus.  The Court does not need to determine the precise date on which HDD incurred the obligation to pay Mr. Miller the $193,167.00.[6]  The proper inquiry is whether HDD had a legal obligation to pay Mr. Miller a bonus when Mr. Haub determined the $193,167.00 amount.  The Court holds that Mr. Haub's oral promise to pay Mr. Miller an annual bonus between $150,000.00 and $250,000.00 was enforceable against HDD.

---

[6] If HDD incurred the obligation to pay Mr. Miller the bonus when Mr. Haub made the oral promise, then this obligation is not avoidable because it would have been incurred while HDD was solvent.  If the obligation was not incurred until Mr. Miller performed all of his 2009 sales (December 31, 2009), then the $193,167.00 obligation is not avoidable because HDD received reasonably equivalent value by satisfying its existing legal obligation to pay Mr. Miller his annual bonus.

To create an enforceable contract between HDD and Mr. Miller, Mr. Haub's oral promise to pay the bonus must be (i) supported by valuable consideration and (ii) be sufficiently definite in its terms. *See e.g.*, 43 A.L.R.3d 503 (Originally published in 1972)("As with contracts generally, an employer's promise to pay a bonus to his employee or employees must be supported by a valuable consideration and must be sufficiently definite in its terms in order to create a valid and enforceable contract.").

If Mr. Miller's annual bonus was completely discretionary, then Mr. Miller could not have recovered a bonus if HDD refused to pay him one. *See, e.g., Stavis v. GFK Holding, Inc.*, 769 F. Supp. 2d 330, 339 (S.D.N.Y. 2011)(Employer's payment of $5,000 bonus to employee, rather than $25,000, was not a breach of contract even though employment contract set a target of $25,000, where offer letter explicitly provided that bonuses were discretionary and based on the overall performance of the company).  Unless there was a prior commitment by HDD, the reasonably equivalent value received by HDD in exchange for incurring the $193,167.00 obligation could not be Jay Miller's 2009 sales because this would constitute "past consideration." *See Castranova v. Teknekron Infoswitch, Inc.*, 2003 WL 22143793 (N.D. Tex. Aug. 18, 2003) (holding that an employer's promise to pay a bonus is not supported by consideration when the employer made the promise when the employee already had a pre-existing duty to perform his or her job).

In this case, the evidence reflects a prior commitment by HDD.  Mr. Haub's oral promise to pay Mr. Miller a bonus within the $150,000.00 to $250,000.00 range induced Mr. Miller to leave Enroc to come work for HDD.  While working for Enroc in 2008, Mr. Miller earned approximately $200,000.00 a year: a salary of $120,000.00 and a bonus of $80,000.00.  His testimony was that he would not have left Enroc and accepted a job at HDD for about the same

salary ($125,000.00) but no bonus. Accordingly, it appears that Gary Haub's oral promise that HDD would pay him a minimum bonus of $150,000.00 induced Miller to come work for HDD. This demonstrates that Mr. Haub's oral promise to pay Mr. Miller a substantial bonus was a bargained for exchange. Accordingly, Mr. Haub's promise to pay Mr. Miller a bonus between $150,000.00 and $250,000.00 was supported by consideration.

In the October 15, 2013 Memorandum Opinion, this Court held that "Mr. Miller and Mr. Haub's oral understanding of how bonuses would be paid was *too indefinite and discretionary to become binding* on HDD. HDD did not incur the obligation to pay the $193,167.00 in bonuses until Mr. Haub and Mr. Miller agreed to increase the promissory note to $293,167.00." (ECF No. 36 at 6-7). This finding was based on incomplete evidence.

In light of the more complete evidence presented during the March 7, 2014 hearing, the Court reconsiders whether Mr. Haub's oral promise to pay Mr. Miller an annual bonus was binding against HDD. The issue in this case is whether Mr. Haub's promise was too indefinite or too discretionary to be enforceable against HDD.

Although Mr. Miller testified that his annual bonus was discretionary, the evidence demonstrates that Mr. Miller's minimum annual bonus was $150,000.00. Gary Haub's representation that Mr. Miller *should expect* his annual bonus to fall within a certain range was an implied promise that Mr. Miller would receive at least a $150,000.00 annual bonus. *See, e.g. George A. Fuller Co. v. Brown*, 15 F.2d 672, 676 (4th Cir. 1926)(noting that "[t]he fact that the word 'expects' was used instead of the word 'promises' cannot change the matter. The law regards substance and not form, and it is perfectly clear that the language used was intended as an offer, and that it was accepted and acted upon as such.").

In an analogous case, the Texas Court of Appeals held that when an employer promises to pay a bonus within a certain range, such a promise would imply an agreement to pay at least the minimum amount designated and that the court could supply a reasonable amount within the range. *See Fruth v. Gaston*, 187 S.W.2d 581, 584 (Tex. Civ. App. 1945).  The Texas Court of Appeals held:

> If, in addition to the salary and 1% on gross sales, Gaston agreed to pay a percentage of net profits not to exceed five per cent and in no event not less than three, **the law would imply a reasonable percentage within these limits**; and such a promise, after Fruth had performed the services for which it was made, could not be construed as so indefinite and uncertain as to bar his recovery of any part thereof. **Such a promise would imply an agreement to pay at least the minimum amount designated**…

*Fruth v. Gaston*, 187 S.W.2d 581, 584 (Tex. Civ. App. 1945)(citations omitted); s*ee also Sibley v. Stetson & Post Lumber Co.*, 110 Wash. 204, 188 P. 389 (1920)(holding that an agreement by an employer to pay a servant a bonus of between $400 and $500 at the end of each year was not too indefinite or uncertain for enforcement); *Schloss v. Davis,* 213 Md. 119, 124, 131 A.2d 287, 290 (1957) ("In the instant case we think the agreement as to price [expressed as a range] was not too vague to support recovery at the minimum figure.").

In this case, the Court heard testimony that (i) Mr. Miller was entitled to an annual bonus between $150,000.00 and $250,000.00; (ii) that bonus was calculated considering Mr. Miller's gross sales and other factors; (iii) Gary Haub calculated an amount that was within the range that he promised Mr. Miller ($193,167.00); and (iv) Mr. Inman, an owner of HDD, corroborated Mr. Miller's contention that the $193,167.00 was for his bonuses.  Accordingly, Mr. Haub's promise constitutes an implied agreement to pay Mr. Miller a bonus of at least $150,000.00 for his 2009 sales.

Mr. Haub's promise to pay Mr. Miller an annual bonus within a certain range was not too indefinite to be enforceable against HDD. "[I]f an alleged agreement is so indefinite as to make it impossible for a court to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract. To be enforceable, the parties must agree to the material terms of the contract." *Shaw v. Palmer*, 197 S.W.3d 854, 856 (Tex. App. 2006)(citations omitted).  For example, in *Douglass v. Panama, Inc.*, the Texas Court of Appeals held that an employer's promises to pay "good bonuses next year" was too indefinite to be enforceable. *Douglass v. Panama, Inc.*, 487 S.W.2d 228 (Tex. Civ. App. 1972).

However, in cases where the parties intend to make a binding agreement and the price can be ascertained through extrinsic facts, courts will usually enforce the agreement.  "Where the parties have done everything else necessary to make a binding agreement for the sale of goods or services, their failure to specify the price does not leave the contract so incomplete that it cannot be enforced. In such a case it will be presumed that a reasonable price was intended." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008); *see also* 1 Williston on Contracts § 4:25 (4th ed.)("In short, although the necessity for definiteness may compel the court to find that the language used is too uncertain to be given any reasonable effect, when the parties' language and conduct evidences an intent to contract, and there is some reasonable means for giving an appropriate remedy, the court will strain to implement their intent.  Thus if a promise indefinite as to price is capable of being made certain by an objective standard through extrinsic facts, it will be enforced.").

In this case, the evidence demonstrates that the bonus amount owed to Mr. Miller was capable of being ascertained by an objective standard through extrinsic facts. *See* 1 Williston on Contracts § 4:25 (4th ed.).  Although there was no written agreement and Mr. Miller could not

articulate the precise formula used to calculate his annual bonus, the Court heard testimony that Mr. Inman also had an unwritten agreement with HDD to receive an annual bonus based on his sales.  He testified that he received bonuses in previous years, including one between $30,000.00 and $50,000.00.  Mr. Miller testified that in 2007, while Mr. Miller was working for Enroc, he sold $6,000,000.00 in pipe and received a bonus of at least $60,000.00 (at least 1.0% of his gross sales).

Under these facts, if HDD refused to pay Mr. Miller his annual bonus for 2009, he could have enforced the oral agreement against HDD.  Based on the rationale employed in *Fruth*, the law would imply an agreement to pay at least $150,000.00 and the Court could supply a reasonable amount within the $150,000.00 to $250,000.00 range. *Fruth v. Gaston*, 187 S.W.2d 581, 584 (Tex. Civ. App. 1945); *see also* Restatement (Second) of Contracts § 204 (1981)("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.").  The Court would have had several extrinsic facts it could use to calculate a reasonable amount within the $150,000.00 to $250,000.00 range.  For example, the Court could have compared Mr. Inman's gross sales during the year he received a $30,000.00 to $50,000.00 bonus and calculate Mr. Miller's bonus based on the same percentage of gross sales paid to Mr. Inman.

Even if Mr. Haub's oral promise to pay the bonus was not enforceable in contract law, Mr. Miller could have recovered from HDD under a quantum-meruit theory: "If the promise which was originally definite is performed, this cannot make the indefinite promise enforceable but may give rise to a quasi-contractual obligation to pay the fair value of what has been received." 1 Williston on Contracts § 4:32 (4th ed.); *see also* Restatement (Second) of Contracts

§ 34 (1981)("The need for a particular remedy may sometimes become apparent as a result of part performance or other action in reliance on an indefinite agreement, even though the original uncertainty remains… Thus benefits conferred on the other party under an agreement void for indefiniteness may ordinarily be recovered."); S*ee e.g.*, *Cent. Texas Micrographics v. Leal*, 908 S.W.2d 292, 298-99 (Tex. App. 1995)(finding that there was legally and factually sufficient evidence to support the jury's finding of detrimental reliance where employee relied on employer's oral promise to pay employee a salary plus an unspecified share of the proceeds of the litigation that the employee was working on).

Accordingly, the Court finds that Mr. Haub's oral promise that HDD would pay Mr. Miller a bonus of between $150,000.00 and $250,000.00 was enforceable against HDD. HDD received reasonably equivalent value by satisfying its existing obligation to pay Mr. Miller his annual bonus.

The Court also rejects Mr. Ogle's contention that Mr. Miller's sales did not benefit HDD just because HDD Rotary reported a loss of $3,523,014.00 for 2009. (Exhibit 14 at 5). The evidence shows that the $193,167.00 bonus was a fair bonus and that Mr. Miller's 2009 sales provided ample benefit to HDD Rotary.  HDD's 2009 tax return shows that that HDD reported (i) $16,741,057.00 in gross sales, (ii) $1,250,436 in gross profit, and (iii) a 7.5% gross margin for 2009.  *Id*.  In 2009, Mr. Miller sold $9,155,472.59 of HDD's $16,741,057.00 in gross sales.  Mr. Miller testified that he normally sold equipment at a 25-30% margin and drill pipe at a 10% margin.  Even assuming that Mr. Miller's gross margin on sales was similar to HDD's 7.5% gross margin, then he was responsible for $683,847.65 of HDD's gross profits in 2009.

In sum, (i) Mr. Haub's oral promise to pay Mr. Miller an annual bonus was enforceable against HDD; (ii) the $193,167.00 bonus amount was an appropriate bonus for Mr. Miller's 2009

sales; and (iii) HDD received reasonably equivalent value by satisfying its legal obligation to pay Mr. Miller an annual bonus.

### Recharacterization of the 193,167 Debt Owed to Jay Miller

Although the $193,167.00 debt arose from an agreement between Mr. Miller and HDD for bonus compensation, the evidence shows that both parties booked the origin of this debt as a stock redemption for Jay Miller's equity interest in HDD.

HDD Rotary recorded the $193,167.00 as an obligation arising from the purchase of Jay Miller's equity interest in HDD.  Mr. Ramey and Mr. Odom both testified that they recorded the entire $293,167.00[7] amount owed to Mr. Miller as the purchase price for the redemption of Jay Miller's interest in HDD based on an oral representation from Gary Haub.  Neither Mr. Ramey nor Mr. Odom confirmed the origin of the $293,167.00 debt with Mr. Miller.  They only confirmed that this was the correct amount owed to him.

JT Miller Inc. also recorded the $193,167.00 debt as an obligation arising from the redemption of his shares.    A JT Miller Inc. document characterized the $193,500.00 obligation as a "shareholder distribution". (Exhibit 7).  JT Miller's books indicate that the nine transfers between June 2 and July 9, 2010 were applied to satisfy the $193,500.00 amount owed to JT Miller.  Mr. Miller speculated that Deanna Reynolds, the bookkeeper for HDD Rotary, likely came up with the term "shareholder distribution" when advising Ken Deason on how to book these entries.  Even if the Court accepts this testimony, Mr. Miller acquiesced to having this $193,167.00 debt booked as an obligation owed to him for the stock redemption.

---

[7] HDD Rotary's books show that HDD's $100,000.00 obligation (incurred on June 30, 2009) was converted back into equity on March 31, 2010.  There was no other evidence to support the claim that the $100,000.00 payable owed to Mr. Miller was converted back into equity in 2010. The Court finds that this reconversion did not occur, and that the books are in error.

The parties' misreporting the $193,167.00 debt as a stock redemption instead of a bonus obligation does not give rise to an independent "transfer" under section 101(54) of the Bankruptcy Code.  Section 101(54) of the Bankruptcy Code defines "[t]he term 'transfer' as "the creation of a lien; the retention of title as a security interest; the foreclosure of a debtor's equity of redemption; or each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of *disposing of or parting with property or an interest in property*."") (internal punctuation and lettering omitted). *See* 11 U.S.C. § 101(54).  Mr. Odom and Mr. Ramey both testified that they recorded the $193,167.00 as a stock redemption based on Mr. Haub's oral representation.  Mr. Haub's oral representation to HDD's accountants cannot by itself constitute an agreement between the parties to swap Mr. Miller's bonus obligation into an obligation arising from his stock redemption.   There was no evidence presented that the parties agreed to have the $193,167.00 bonus obligation converted into equity for tax purposes or otherwise.   The best evidence shows that HDD Rotary booked the $193,167.00 bonus obligation as a stock redemption and JT Miller Inc. acquiesced to this characterization by recording the $193,167.00 as a "shareholder distribution" at the direction of HDD Rotary's bookkeeper.

### Transfers of HDD Inventory and Equipment to JT Miller Inc.

On several occasions between June and December of 2010, Mr. Miller received equipment and inventory from HDD to satisfy the $193,167.00 obligation and the $100,000.00 obligation.

According to Exhibit 4, prepared by HDD Rotary Sales, the first two transfers of equipment and inventory were applied to satisfy the $193,500.00 obligation owed to Mr. Miller. The sum of the two earliest transfers is exactly $193,167.00.[8]  HDD Rotary applied the last six

---

[8] HDD recorded a transfer of $135,823.00 worth of equipment on June 15, 2010 and a transfer of $57,344.00 worth of equipment on July 15, 2010.

transfers (from July 16 to December 31, 2010) to reduce the $100,000.00 payable owed to Mr. Miller.

Exhibit 6, prepared by JT Miller Inc., consists of nine invoices[9] evidencing a series of transfers of inventory and equipment from HDD Rotary to JT Miller Inc. from June 2 to July 9, 2010.  Mr. Miller testified that each of these transfers were in satisfaction of his $193,167.00 receivable.  The sum of the invoices is $195,823.00.  Exhibit 7 shows that JT Miller Inc. applied these nine transfers to reduce JT Miller Inc.'s $193,167.00 receivable.

Neither the $193,000.00 obligation nor the $100,000.00 obligation is avoidable.  HDD received reasonably equivalent value in exchange for each transfer of equipment and inventory because each transfer reduced a payable to JT Miller Inc.  Each of these transfers were made in partial satisfaction of either (i) the $100,000.00 obligation incurred while HDD was solvent or (ii) the $193,167.00 obligation incurred in connection with Jay Miller's bonus.

Mr. Ogle has not presented any evidence that the sum value of all the equipment and inventory received by JT Miller Inc. was more valuable than the corresponding reductions in HDD's payables to JT Miller Inc.  Accordingly, HDD received reasonably equivalent value for each transfer made between June and December of 2010.

### Trustee's Estoppel Argument

At trial, Mr. Ogle's counsel argued that "[a]n individual cannot make representations to the IRS and then take a contrary position in bankruptcy court."  The Fifth Circuit has held that quasi-estoppel "applies when it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit, or precludes a

---

[9] It appears that JT Miller Inc. broke down the two transfers ($135,823.00 and $57,344.00) recorded by HDD Rotary into nine separate transfers.

party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him." *Long v. Turner*, 134 F.3d 312, 318 (5th Cir. 1998)(citations omitted).

During closing arguments, Mr. Ogle's counsel cited *In re Davidson* to support his estoppel argument. *In re Davidson*, 947 F.2d 1294 (5th Cir. 1991).  In *In re Davidson*, the Fifth Circuit found that Mr. Davidson, who had deducted alimony payments from his income from 1983 through 1986, was estopped from claiming that his payment obligations to Mrs. Davidson were not in the nature of alimony in his subsequent bankruptcy case. *Id*.

Mr. Ogle's counsel argues that Jay Miller's failure to report the $193,167.00 as income on his 2009 personal income tax return is inconsistent with his position in bankruptcy court that the $193,167.00 reflects bonus income for his 2009 sales.  The Court rejects this argument.

Neither Jay Miller nor JT Miller Inc.'s tax returns have been admitted into evidence. Mr. Odom, who prepared tax returns for Jay Miller and JT Miller, Inc., testified that Mr. Miller's 2009 and 2010 tax returns do not treat the $193,167.00 as an amount received for the redemption of his equity interest in HDD.  Mr. Odom explained that Mr. Miller has not yet reported the $193,167.00 as ordinary income because he is a cash basis taxpayer.  He explained that if Jay Miller received the $193,167.00 bonus in cash, then he would have been required to report this as income on his personal income tax return.  Mr. Odom also explained why Mr. Miller's failure to report the $193,167.00 as ordinary income in 2009 and 2010 is consistent with Mr. Miller's position that the $193,167.00 is bonus compensation:  According to Mr. Odom, JT Miller Inc.'s S-corporation tax return, which flows down to Jay Miller's individual return, shows a $293,350.00 equity contribution into JT Miller Inc.  JT Miller Inc. will have to report income as Mr. Miller sells each piece of inventory and equipment (without an adjusted basis), which flows

down to Jay Miller's individual tax return.  According to Mr. Miller, he has not yet sold any of the equipment and inventory.

The Court provided Mr. Ogle with the opportunity to brief whether Mr. Odom's testimony regarding Mr. Miller's tax treatment of the transactions was proper.  Mr. Ogle declined to brief this issue.  Accordingly, there is no evidence to support Mr. Ogle's estoppel argument.

### Recommendation

The Court recommends that the District Court grant judgment to J.T. Miller and to Jay Miller on Mr. Ogle's fraudulent transfer claims.

SIGNED **June 27, 2014.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE